IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**FILED**
JUN 22 2021
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

MARY JORDAN
  Plaintiff 1, Pro se

JEROME WILLIAMS
  Plaintiff 2, Pro se

-vs-

City of Toledo, et al.
  Defendants

CASE NO: 3:21 CV 1233

JUDGE **JUDGE KNEPP**

**MAG JUDGE CLAY**

COMPLAINT PURSUANT TO
42 U.S.C.§1983

Constitutional & Civil Rights Violations

---

Name & Address of: Plaintiff 1

Mary Jordan
2472 Lawrence
Toledo, Ohio, 43620

Name & Address of: Plaintiff 2

Jerome Williams
516 Bancroft St.
Toledo, Ohio, 43620

Name & Address of Defendant

The City of Toledo
City Hall
401 South Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Toledo Police Department
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Chief of Toledo Police Department
525 North Erie St.
Toledo, Ohio 43604

i

Name & Address of Defendant

Detective Nora Mugler
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Detective Ruby Sanibanez
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Sergeant Joshua J. Bell, Internal Affairs
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Toledo Policeman
John Doe **2**
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Detective Bill Noon
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Sergeant _____ Haney
525 North Erie St.
Toledo, Ohio, 43604

Name & Address of Defendant

Toledo Policeman
John Doe **1**
525 North Erie St.
Toledo, Ohio, 43604

Date June 22, 2021

## COMPLAINT

For the Plaintiffs' complaint against the City of Toledo, Ohio; the Toledo Police Department; the Chief of Police of the City of Toledo, Ohio; and numerous Toledo Police Officers: Plaintiffs Mary Jordan and Jerome Williams allege and state the following. For the willful depravation of their' constitutional rights, under the Fourth and Fourteenth Amendment[1] of the United States Constitution: while at all times acting under the color of state law:

1. The Plaintiff, Mary Jordan (hereinafter Plaintiff 1); and Plaintiff, Jerome Williams (hereinafter Plaintiff 2) is suing the following defendants in their official capacities for money damages – compensatory and punitive:

   a. The City of Toledo, Ohio

   b. The Toledo, Ohio, Police Department

2. Plaintiff 1 and Plaintiff 2 is, also, suing the following defendants in their official and individual capacities for money damages:

   a. The Chief of Police of the City of Toledo, Ohio: George Kral.

   b. Councilman Tyrone Riley

   c. Detective Nora Mugler; of the Toledo Police Department Gun Crime Task Force

   d. Detective Bill Noon; of the Toledo Police Department

   e. Detective Rudy Santibanez; of the Toledo Police Department

---

[1] The Fourth Amendment is made applicable to the states through the Fourteenth Amendment.

    f. Sgt. _____ Haney, of the Toledo Police Department

    g. Sgt. Joshua J. Bell; of the Toledo Police Department, Internal Affairs Division

    h. Toledo Police Officer, John Doe

    i. Toledo Police Officer, John Doe

## PARTIES – JURISDICTION - VENUE

3. The Plaintiffs resident of Toledo, Ohio, (Lucas County): thereby jurisdiction, and venue, is proper had, in and before, this Court in accordance with 28 USCS § 1331.[2]

## SPECIFIC CLAIMS

4. The City of Toledo, Ohio: is liable where the acts of its employees and/or agents caused constitutional deprivation, under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14, to citizens of the United States while acting pursuant to policy and/or custom.

5. The Chief of Police of the City of Toledo, Ohio: George Kral is liable where being place on notice that several of his subordinates, *several being department heads*,

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *Viola v. Ohio,* 2021 U.S. Dist. LEXIS 26701,[*35](N.D. Ohio).

had and continued to willfully violate the constitutional rights of citizens, under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I,§ 14, via unwritten custom and practice: and the need to take some action to control his subordinates is so obvious to cause the discontinuation of his subordinates wanton action: yet the Chief remains deliberately indifferent to the need.

6. Detective Nora Mugler; of the Toledo Police Department Gun Crime Task Force: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

7. Detective Bill Noon; of the Toledo Police Department: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

8. Detective Rudy Santibanez; of the Toledo Police Department: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

9. Sgt. _____ Haney, of the Toledo Police Department: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

10. Sgt. Joshua J. Bell; of the Toledo Police Department, Internal Affairs Division: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

11. Toledo Police Officer_____ Russell: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

12. Toledo Police Officer, John Doe 1: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

13. Toledo Police Officer, John Doe 2: is liable to Plaintiffs' 1 and 2 for the knowing and wanton violations of the their rights under the Fourth and Fourteenth Amendment

of the United States Constitution, as well as the rights under Ohio Constitutional Article I, § 14.

## FACTUAL BACKGROUND

14. Beginning on July 4, 2019, the above defendants *knowingly* violated, and conspired to violated, Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution, as well as their' rights under Ohio Constitutional Article I,§ 14; by unlawfully searching the backyard of Plaintiff 1's residence – 2472 Lawrence, Toledo, Ohio - *without a warrant or without permission:* where upon said illegal search Sgt. Haney and Det. Nora Mugler *allegedly* located and collected ten (10) 9mm casings and three (3) 7.62 shell casings near the back porch of Plaintiff's residence. And then used said *unlawfully obtained* shell casings as probable cause, with an *alleged* verbal statement from an anonymous caller on or about 05/04/2019 – stating that the Plaintiff's Grandson, Jerome Williams and Robert McMillian were involved in a shooting -- as the basis to acquire a residential search warrant for Plaintiff's house, on 09/10/2019.[3]

15. On 09/11/2019, at 1400 hours, equipped with the *ill begotten* search warrant[4]: Det. Nora Mugler and several unknown Toledo police officers arrived at Plaintiff residence to execute said warrant, gaining entry by batter-ramming the front door open and soon after gaining entrance it was discovered that no one home. There

---

[3] The residential search warrant was sought and acquired *not* under Plaintiff's name- the sole titled owner of the residence – but instead under Plaintiff's grandson's name, Jerome Williams: said residence has never been Mr. Williams official residence: although he is allowed access to said residence on a regular occasion, with overnight guess privileges.
[4] Issued by Judge Myron Duhart, on 09/10/2019.

said officers began their' search. But, unbeknown to said police officers, the noise caused by them batter ramming the front door, and *destructively* searching the residence, alerted several of Plaintiff's neighbors: one of whom took notice that it was the police in plaintiff's residence and immediately began to video and audio recorded...

16. The video and audio recording captured numerous windows on the first, second and third floor of the residence being broken and shattered *from the inside out*[5]; as well as the noisy destruction of the residence's property inside the house.[6]

17. Plaintiff is in possession of the recording – which can be easily verified by the contained date and time recorded *digitally stamped* thereon -- and the name of the neighbor who recorded it.

18. Another neighbor, witnessing the police activities, placed phone calls to several of Plaintiff 1's relatives; one being to a niece of Plaintiff 1 – Ms. Gloria Pankey.

19. Upon Plaintiff 1 arrival home later that evening, accompanied by Ms. Gloria Pankey and several other members of the family, they all immediately noticed the damage to the outside of her house. That is, over ten windows broken out, including her front picture window; and her front door hanging from just one of the hinges. Soon as Plaintiff 1's *and her companions'* exited the vehicle several of her neighbors -

---

[5] "Had the breaking of the windows been unreasonable...may violate the Fourth Amendment." *Hudson v. Michigan*, 547 U.S. 584, 602.

[6] "[A] claim for compensation for property unnecessarily damaged or destroyed during the execution of a search may be brought under 42 U.S.C. § 1983 on a Fourth Amendment ... *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2001); *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999); *United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000). But that, and not exclusion, is Heyer's only potential remedy." *United States v. Heyer*, 2018 U.S. Dist. LEXIS 216 496, [**14-15] (D.Mass 2018).

approached them and informed them that the police "did that to her house". Further, one neighbor informed her that she had started video and audio recording soon after the police entered her house: even capturing the police as they were exiting the house...

20. Plaintiff 1, accompanied by her niece, grandson and one of the neighbors entered her residence, there, they were *then all confronted to their' utter dismay* all the damage done to the house. For example: lamps and mirrors busted on the floor all throughout the house, i.e. in living room, dining room, bedrooms, and even in the bathrooms – were therein the sink and toilet was also badly damaged ; the cushions of the sofa and chairs severely cut open; the contents of the refrigerator opened and smashed all over the kitchen, furniture destroyed; etc...[7]

21. Plaintiff 1's niece, Gloria Pankey, was the one of the first people to see a copy of the search warrant the police had left there.

22. Later, upon Plaintiff 2 being shown the copy of the search warrant, and immediately taking notice of falsehoods upon which it was based, Plaintiff 2 acquired a copy of the affidavit on which the search warrant was based.

23. And as he suspected, contained within said copy of the "AFFIDAVIT FOR SEARCH WARRANT" there existed a multitude of untruths in support of probable cause: as well as reference to *unlawfully obtained* evidence -- collected in violation of Fourth Amendment to the United States Constitution -- in support of probable cause.

---

[7] Plaintiffs took video on that day, 09/11/2019, of the damage caused inside the house.

24. Which clearly reveals that, Det. Noon and Det. Mugler conspired to *knowingly* put forth false information and unlawfully obtained evidence for the sole purpose to establish probable cause in obtain the search warrant.[8] To wit:

(a) *At no time* did Plaintiff 2 ever inform, admitted or declared to any police officer, including Detective Bill Noon in 2007, that he was a Lawrence Blood Villain member.[9]

(b) Nor had Plaintiff 2 been observed at Plaintiff 1's residence with gang members on the September 5, 2019, or otherwise: in spite of Det. Noon's *vague* statement to the contrary. In support of probable cause. Det. Noon declared: "As recently as of September 5, 2019, Williams has been observed at his residence with other members of the Lawrence Blood Villains..." *Allegedly, observed by whom?*[10]

(c) Further, to Plaintiff 2's knowledge, Tild Reed and Ben Barnett has never been charged and/or convicted of being gang members. And, in fact, since the age of seven or eight have been *childhood friends* of Plaintiff 2.

---

[8] "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Bickerstaff v. Lucarelli*, 2015 U.S. Dist. LEXIS 43603 [*15](N.D. Ohio).

[9] *Det. Noon had/has a history of falsely asserting* that an individuals had previously admitted to him their' gang membership. *See, State v. Roberson*, 2017 Ohio 4339,[*P78](6th App. Dist.). Further, *solely for the sake argument*, R.C. 2923.42(A) mandates that *active participation* in gang activity be shown.

[10] Corroborating evidence is necessary "in the absence of a statement detailing the manner in which the information was gathered." *U.S. v. Marino*, 682 F.2d 449, 453 (3d Cir. 1982) (quoting *Spinelli v. U.S.*, 393 U.S. 410, 416, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)).

(d) Plaintiff was not present nor involved in any shooting incident, *whatsoever*, on May 4, 2019, *period*. In fact, Plaintiff 2 is in possession of evidence clearly proving that he was in Cleveland, Ohio, from May 2, 2019 to May 7, 2019.

(e) Within the "AFFIDAVIT FOR SEARCH WARRANT" the defendant readily admits, under paragraph 4.b, that: "On July, 4, 2019, Police responded to 2469 Maplewood on a ShotSpotter alert, for shots fired. Crews did not locate any evidence. At 1025 in the morning, Sgt. Haney and Detective Rudy Santibanez arrived at 2469 Maplewood, on a ShotSpotter follow up. Upon searching the area, Sgt. Haney and this Detective locate (10) 9mm casings and (3) 7.62 shell casings near the back porch of 2472 Lawrence, the residence of Jerome Williams.[11]" *Id.*

(f) The end of Plaintiff 1 backyard is installed a privacy fence, with an accompanying no trespassing sign.

---

[11] "While the deficiencies in the record in this matter are troubling, even more troubling is the State's insistence that its officers were within their right to enter Mr. Littell's backyard. According to the State, its officers did not need a warrant ...because they 'were in an area where any 'reasonably respectful citizen' was permitted to go.' It appears to be the State's position that its officers, knowing full well that Mr. Littell had contraband in his backyard, could enter his backyard for the stated purpose of establishing contact and, as soon as they saw the contraband they knew to be there, could lawfully seize the contraband. The Fourth Amendment cannot possibly be construed to condone such a practice. Police officers may approach a home, knock on its front door, and speak to its residents without a warrant 'because that is 'no more than any private citizen might do.'" *Jardines*, 133 S.Ct. at 1416, quoting *Kentucky v. King*, 131 S.Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011). Custom dictates that, absent indications to the contrary, every homeowner has given an implied license to visitors for just that purpose. *Jardines* at 1415. That license 'typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.' *Id.* The license 'is limited not only to a particular area but also to a specific purpose.' *Id.* at 1416. '[T]he * * * social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id. See also id.* at 1422-1423 (Alito, J., dissenting) ('A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use.'). Quite apart from any reasonable expectation of privacy analysis,'[t]hat [] officers learned what they learned only by physically intruding on [a person's] property to gather evidence is enough to establish that a search occurred.' *Id.* at 1417." *State v. Littell*, 2014 Ohio 4654(9th Dist.)

25. The police after rendering the house unlivable as a direct result of *their'* excessive and unnecessary destruction of property during the execution of the search warrant: then contacted personnel from the Land Bank in their' attempt to have Plaintiff's 1 home classified as unfit for habitation and scheduled for demolition.

26. Plaintiff 1 upon learning of the notice of the pending classification immediately contacted Plaintiff 2, whereas Plaintiff 2 then contacted the Land Bank and was informed that if the house, at 2472 Lawrence, was not showing signs of being brought up to code: it would be scheduled for demolition.

27. Plaintiff 1 and other family members tallied the monies that they could immediately come up with so as to at least begin the external repairs, installing new windows, repairing damaged window frames and the framing around the front door, etc.

28. The police had rendered Plaintiff 1's house to such an unlivable state – over $40,000.00 worth of damage[12] -- that Plaintiff, being without homeowner's insurance and having only a limited income stream(monthly social security in the amount of $693.89 and state public assistance) was force to live with different relatives *for over a year*[13] until members of her family (mainly Plaintiff 2) was able to secure the monies required to fully return her home to livable condition[14]. This process took fourteen (14) months from 09/11/2019. And, to date, Plaintiff 1 has yet

---

[12] Plaintiffs received, and maintained, estimates from two different reputable contractors.
[13] Which cause Plaintiff 1 undue mental and physical hardships - due to her age. Plaintiff 1's date of birth is 05/11/1926.
[14] The plaintiffs have retained the material and repair receipts.

to move back into her house full time: because her relatives fear that the police will return to harass her again.

29. Whereas, this was not the first time the City of Toledo has been held financially liable for the intentional violation of Plaintiff's 1 constitutional rights, under the fourth and fourteenth amendments – curtesy of the Toledo Police Department's willful misconducts and unnecessary destruction. *A prime example of the continuation of malicious and wanton disregard for Plaintiff 1's constitutional rights.*

30. Plaintiffs has evidence of the nice pre-search condition of Plaintiff's home – 2472 Lawrence, Toledo, Ohio.

31. On or about 09/17/2019 Plaintiff 1's niece, Ms. Gloria Pankey, called and later met with city councilman Tyrone Riley: bringing with her the video and audio evidence of the police's 09/11/2019 *search* of 2472 Lawrence. The video and audio evidence clearly demonstrated/demonstrates the excessive, willful and totally unnecessary destruction of the Plaintiff 1's home and property. Councilman Riley, seeming appalled by the irrefutable evidence of the damage caused, assured Ms. Pankey that he would thoroughly look into the matter and get back with her. But also informed her that in his experience in dealing with the Toledo Police Department for his constituents, concerning some of their' officers' unprofessional tactics, he usually received a less that fruitful response.

32. After waiting for a reasonable amount of time, even leaving numerous voice mail inquires on his service, and not hearing anything further from Councilman Riley concerning any disciplinary actions taken against the responsible police officers.

33. The Chief of Police of the City of Toledo, Ohio: George Kral, was then notified on or about 10/25/2019 and made fully aware of the destructive search of the residence at 2472 Lawrence performed by Detective Nora Mugler and several other police officers on 09/11/2019. And, again, after not receiving any notice regarding disciplinary actions taken against any of the *responsible police officers*[15]. She informed the plaintiffs of the inaction.

34. Plaintiff 2, then decided to pursue the matter, himself, by going to the Toledo Police Station, in January of 2020: equipped with the video recording: (a) captured the numerous police cars at 2472 Lawrence, during the 09/11/2019 search; (b) the destruction of the windows of his grandmother's house *from the inside out*; as well as (c) the police officers on the second floor destroying property – viable through the shattered second floor *window*. Upon his arrival, Plaintiff 2 informed the police officer, located at the front desk, that he would like to speak with someone in internal affairs so as to lodge a complaint against Det. Nora Noon, Det. Mugler and all the other police officers responsible for the unnecessary willful destruction of his grandmother's house and property during their 09/11/2019 search.

35. Plaintiff 2, was then instructed to have a seat and someone would be called. After waiting in the lobby for close to a half hour, Patrolman Russell entered the police station and upon seeing Plaintiff 2, Officer Russell used his cell phone and called internal affairs himself, stating to whomever answered the phone that Plaintiff 2 was

---

[15] Mere acquiescence by police chief when he is on notice of constitutional violations by his subordinates is sufficient to trigger liability under section 1983. See, Black v. Stephens, 662 F. 2d 181, 189(3rd Cir. 1981).

36. hear in the lobby to lodge a complaint against several detectives in relation to his house being search. Patrolman Russell went on to say to the person on the phone: "to tell compartment Dan to tell Det. Bayle (or Det. Bell) that if they call that in that is going to be everything."[16]

37. Sgt. Joshua J. Bell; of the Toledo Police Department, Internal Affairs Division, then met with Plaintiff 2 and upon hearing Plaintiff 2 out, as well as viewing the video and audio recordings of the 09/11/2019 search informed Plaintiff 2 that it was nothing *his* department (internal affairs) could do. Plaintiff 2 then requested to speak with Sgt. Bell's supervisor, whereas Sgt. Bell said his supervisor was the Chief Kral. And when Plaintiff 2 then requested to speak to Chief Kral: Sgt. Joshua J. Bell can be seen and heard on audio and video recording telling Plaintiff 2 that he can't speak to the Chief and to take the matter to court.[17]

38. On several days, after this occurrence, Plaintiff 2 placed phone calls to the Toledo Police Department to speak with the police Chief – on or about 02/03/2020 and 02/12/2020 -- and on each occasion he was informed, either, the Chief wasn't in or he was currently unavailable. Plaintiff 2 then requested, therein, to be scheduled for

---

[16] Plaintiff 2, upon noticing Officer Russell entering the police station and looking at him in strangely, intuitively began to video and audio record Patrolman Russell while Officer Russell was on the phone with someone from internal affairs.

[17] Under section 1983, a municipal entity may be held liable only when "action pursuant to official municipal policy of some nature causes a constitutional tort."*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, (1978). A single act or decision, in appropriate circumstances, "may qualify as an official government policy, though it be unprecedented and unrepeated.

an appointment with the Chief: whereas, he was informed that there was no available calendar space.[18]

39. The defendants clearly acted in bad faith and with malice: i.e, the intentional infliction of emotional distress.

40. As a result of *said search*, the only items the police were able to seize were:

    a) Five (5) 40 Cal. Rounds

    b) One (1) 9mm round

    c) One (1) Pistol magazine

41. No criminal charges were lodged against either of the Plaintiffs as a result of the search.

## Relief Sought

**Plaintiff 1** seeks compensatory damages in the amount of $1,000,000.00 dollars; and punitive damages in the amount of $10,000,000.00 dollars from the City of Toledo, Ohio.

**Plaintiff 1** also seeks compensatory damages from each of the remaining defendants in the amount of $200,000.00; and punitive damages in the amount of $500,000.00.

**Plaintiff 2** seeks compensatory damages in the amount of $300,000.00; and punitive damages in the amount of $5,000,000.00 dollars from the City of Toledo, Ohio.

**Plaintiff 2** also seeks compensatory damages from each of the remaining defendants in the amount of $100,000.00; and punitive damages in the amount of $250,000.00.

*/s/ Mary Jordan*
Mary Jordan

*/s/ Jerome Williams*
Jerome Williams

---

[18] Plaintiff 2 asked the name of the police officer who answered and refused to schedule him an appointment but no name was given on both occasions.